IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

TAMMI N. SOLLENBERGER,    :
    :
    Plaintiff    :
    :
    v.    :    CIVIL NO. 3:12-CV-01885
    :
CAROLYN W. COLVIN, ACTING    :    (Judge Kane)
COMMISSIONER OF SOCIAL    :
SECURITY,    :
    :
    Defendant    :

## **MEMORANDUM**

Plaintiff Tammi N. Sollenberger has filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Sollenberger's claim for supplemental security income benefits. (Doc. No. 1).

## I. **BACKGROUND**

Sollenberger filed her application for supplemental security income benefits on August 23, 2010, claiming that she became disabled on August 1, 2007. Tr. 250. Sollenberger has been diagnosed with numerous impairments, including right shoulder brachial plexopathy and tendinopathy, left shoulder arthritis at the acromioclavicular ("AC") joint, right carpal tunnel syndrome, right and left hand tendonitis, mild spondylosis and stenosis of the cervical spine, depression, anxiety, gastroesophageal reflux disease, hyperlipidemia, asthma, a lumber strain,

hyperthyroidism, and mild tendinopathy of the left ankle . Tr. 12.  On February 7,

2011, Sollenberger's application was initially denied by the Bureau of Disability

Determination.  Tr. 119.

On March 24, 2011, Sollenberger requested a hearing before an

administrative law judge ("ALJ").  Tr. 124.  The ALJ conducted a hearing on

December 22, 2011 and again on May 15, 2012;[1] Sollenberger was represented by

counsel at both hearings.  Tr. 22-60, 63-87.   On May 22, 2012, the ALJ issued a

decision denying Sollenberger's application.  Tr. 10-22.  On August 1, 2012, the

Appeals Council declined to grant review.  Tr. 1.  Sollenberger filed a complaint

before this Court on September 20, 2012.  (Doc. No. 1).  Supporting and opposing

briefs were submitted and this case became ripe for disposition on February 7,

2013, when Sollenberger declined to file a reply brief.  (Doc. Nos. 12, 13).

Sollenberger appeals the ALJ's determination on four grounds: (1) the ALJ

failed to properly account for the side effects caused by Sollenberger's

medications, (2) the ALJ failed to properly account for Sollenberger's mental

impairments, (3) the ALJ erred in failing to give greater weight to the opinion of an

examining physician than to two non-examining physicians, and (4) the ALJ's

determination that Sollenberger could perform two jobs that exist in sufficient

---

[1] An initial ruling was issued by the ALJ dated January 3, 2012.  Tr. 96-104.  On March 9, 2012,
this decision was overturned by the Appeals Counsel and remanded to the ALJ, tr. 109-12,
thereby necessitating the second hearing.

numbers in the national economy is not supported by substantial evidence.  For the reasons set forth below, the decision of the Commissioner is affirmed.

II.   **Statement of Relevant Facts**

Sollenberger is 40 years of age, did not attend school beyond the eleventh grade, and is able to read, write, speak and understand the English language. Tr. 24, 293.  Sollenberger has not obtained a GED and has no vocational training.  Tr. Id.  She does not have any past relevant work.  Tr. 18.

A.     **Sollenberger's Impairments**

The relevant medical records begin on February 4, 2009 when Sollenberger had her first appointment with Stephen Flack, MD.  Tr. 459.  At this appointment, Sollenberger stated that she had continual pain in her left shoulder; no diagnosis was reached.  Id.  On March 24, 2009, Sollenberger was examined by a certified physician assistant, Daria Pellegrino, where it was noted that Sollenberger's left shoulder was "painful with any type of rotating movement or extension."  Tr. 395. Ms. Pellegrino set up an appointment for an MRI of Sollenberger's left shoulder to diagnose the problem.  Id.

On April 4, 2009, an MRI was taken of Sollenberger's left shoulder.  Tr. 375.  This MRI revealed an anterior osteophyte[2] over the acromion and probable

---

[2]  Osteophytes are commonly referred to as bone spurs, which are "bony projections that develop along the edges of bones." Mayoclinic.com, Bone Spurs Definition, *available at* http://www.mayoclinic.org/diseases-conditions/bone-spurs/basics/definition/con-20024478 (last visited May 8, 2014).

mild tendonitis near the AC joint.  Id., tr. 372, 459.   The MRI results led Shabbar

Hussain, MD to perform surgery on Sollenberger wherein he removed a portion of

Sollenberger's clavicle bone and a portion of the acromion.  Tr. 372.  At follow-up

appointments, Dr. Hussain consistently noted that Sollenberger was "doing fairly

well," although she still complained of pain.  Tr. 373-74.  Sollenberger attempted

to alleviate this pain through physical therapy, but the therapy was discontinued

after she failed to achieve noticeable results.  Tr. 482.

On June 29, 2009, a follow-up MRI was performed on Sollenberger's left

shoulder.  Tr. 509.  The MRI revealed a mild shortening of the distal clavicle due

to recent surgery, but revealed no evidence of fracture, dislocation, or bony

destructive change.  Id.  When the pain did not abate, Sollenberger presented to

Albert Tom, MD and Nicole Myers, PA-C for further examination.  Tr. 427.  A

subsequent MRI on October 22, 2009 revealed "some tendonitis of the

subscapularis tendon."  Tr. 426, 590.  On January 13, 2010, Sollenberger was

examined by Mary Bush, MD.  Tr. 520.  Dr. Bush noted that Sollenberger could

not take Tramadol because it caused nausea and an upset stomach, although

Gabapentin was "helping not only with her shoulder pain but with her intermittent

right upper extremity pain."  Id.  Dr. Bush had previously prescribed a

transcutaneous electrical nerve stimulation ("TENS") unit to Sollenberger, and at

this appointment Dr. Bush noted that Sollenberger "has gotten a lot of relief with this device." Id.

On December 8, 2009, Sollenberger reported to Dr. Tom and Ms. Myers that she was experiencing significant pain in her right shoulder, radiating into her right arm which caused numbness and tingling in her right hand. Tr. 424. An x-ray "reveal[ed] no acute bony abnormalities," so Dr. Tom and Ms. Myers scheduled an MRI. Id. This MRI, conducted on December 10, 2009, revealed mild teninopathy or tendonitis of the supraspinatus tendon in the right shoulder. Tr. 423, 586. On December 18, 2009, Sollenberger was given a subacrominal injection in an attempt to relieve her pain. Tr. 423. This injection provided some relief, although it did not significantly ease Sollenberger's pain. Tr. 422, 429.

In early January 2010, Stanton Sollenberger, DO conducted an EMG test on Sollenberger. Tr. 414-15. The results of the test were consistent with borderline right carpal tunnel syndrome and a posterior cord brachial plexopathy.[3] Tr. 415. On January 19, 2010, Dr. Tom and Ms. Myers confirmed this diagnosis. Tr. 422.

On January 18, 2010, an MRI of Sollenberger's cervical spine showed a diffuse disc bulge at the C5-C6 vertebrae, causing "some mild central spinal

---

[3]  The brachial plexus is "a network of nerves that sends signals from your spine to your shoulder, arm and hand. A brachial plexus injury occurs when these nerves are stretched, compressed or, in the most serious cases, torn." Mayoclinic.com, Brachial Plexus Injury Definition, *available at* http://www.mayoclinic.org/diseases-conditions/brachial-plexus-injury/basics/definition/con-20028265 (last visited May 8, 2014).

stenosis and some mild right and left neural foraminal" spondylosis.[4]  Tr. 522, 537,

584.  In an attempt to alleviate the pain associated with Sollenberger's cervical

impairments, Dr. Bush gave Sollenberger a series of three epidural steroid

injections.  The first injection was performed on March 23, 2010, after which

Sollenberger reported a seventy-five percent reduction in her pain.  Tr. 471, 527.

The second injection was performed on May 11, 2010, after which Sollenberger

again reported a seventy-five percent reduction in her pain.  Tr. 469, 531.  The

final injection was given on June 30, 2010, although Sollenberger only reported a

twenty-five percent decrease in her pain afterwards.  Tr. 467-68, 535.  A second

cervical spine MRI was conducted on October 12, 2010; this MRI again revealed a

central disc protrusion at the C5-C6 vertebrae producing "mild spinal stenosis."

Tr. 583.  Otherwise the MRI was unremarkable.  Id.

On February 5, 2011, Sollenberger presented to Ms. Pellegrino for an

examination.  Tr. 638-40.  As this appointment, Ms. Pellegrino noted that

Sollenberger suffered from chronic depression, but that the depression was "well

controlled" with medication.  Tr. 638.  On February 18, 2011, Ms. Pellegrino

completed a medical assessment form for the Commonwealth of Pennsylvania

Department of Public Welfare.  Tr. 643.  On this form, Ms. Pellegrino diagnosed

---

[4] "Cervical spondylosis is a general term for age-related wear and tear affecting the spinal disks in your neck. As the disks dehydrate and shrink, bone spurs and other signs of osteoarthritis develop." Mayoclinic.com, Cervical Spondylosis Definition, *available at* http://www.mayoclinic.org/diseases-conditions/cervical-spondylosis/basics/definition/con-20027408 (last visited May 8, 2014).

Sollenberger with depression, cervical spinal degenerative disc disease, asthma, and hyperlipidemia and opined that, as a result, Sollenberger was disabled.  Tr. 644-45.  On February 14, 2012, Ms. Pellegrino noted that Sollenberger had not taken medication for her depression in six months, although she had anxiety or panic attacks "a few times a day."  Tr. 660.

## B.    Residual Functional Capacity Assessments

On January 6, 2011, Dr. Amatul Khalid, a state agency physician, examined Sollenberger.  Tr. 617-18.  Dr. Khalid opined that Sollenberger could never lift or carry more than two pounds,[5] and could only sit for one half hour per eight hour workday, although Dr. Khalid believed that Sollenberger had no walking or standing limitations whatsoever.  Tr. 617.  Dr. Khalid also stated that Sollenberger could not push or pull with her upper extremities, and was limited to occasionally bending, kneeling, stooping, crouching, balancing, or climbing.  Tr. 617-18. Finally, Dr. Khalid opined that Sollenberger had no environmental limitations, but was impaired in her ability to reach, handle, or finger.  Tr. 618.  Dr. Khalid did not provide explanations for any of his opinions.

On February 4, 2011, Louis Tedesco, MD, reviewed Sollenberger's medical files on behalf of the state agency.  Tr. 628.  Dr. Tedesco opined that Sollenberger could occasionally lift or carry up to twenty pounds, and could frequently lift or

---

[5] This finding is plainly at odds with Dr. Khalid's examination notes, wherein he writes that Sollenberger reported she could lift up to five pounds.  Tr. 623.

carry ten pounds.  Id.  Dr. Tedesco believed that Sollenberger could stand and/or walk up to six hours in an eight hour workday, and could sit for equally as long. Id.  Dr. Tedesco opined that Sollenberger was unlimited in her abilities to push or pull, could never crawl or climb ladders, ropes, or scaffolds, could occasionally use ramps, climb stairs, kneel, or crouch, and could frequently balance or stoop.  Tr. 628-29.  Finally, Dr. Tedesco believed that Sollenberger was limited in her ability to reach overhead and should avoid concentrated exposure to vibrations or airborne irritants.  Tr. 629-30.

Dr. Tedesco also reviewed the opinion of Dr. Khalid.  Dr. Tedesco believed that some of Dr. Khalid's opinions were overestimations of the severity of Sollenberger's functional limitations.  Tr. 632.  Dr. Tedesco believed that the limitations were not consistent with the evidence contained within Sollenberger's medical records, and was without substantial support.  Tr. 632-33.

Henry Maimon, MD testified at the May 2012 hearing regarding Sollenberger's residual functional capacity.  Tr. 65-77.  Dr. Maimon testified that he had reviewed all of Sollenberger's medical history that was contained within the administrative record.  Tr. 65.  Dr. Maimon testified that Sollenberger's medical record revealed that her condition was gradually improving.  Tr. 75.  He noted that Sollenberger's left shoulder was "doing well," and the 2010 MRI of Sollenberger's cervical spine only revealed a "small" diffuse bulge at C5-C6 that "could" have

8

caused some central spinal stenosis but there was "no indication of impingement." Tr. 66-68, 74. Dr. Maimon further noted that Sollenberger's x-ray did not reveal any severe degeneration of her cervical Spine. Tr. 71. Dr. Maimon also found it significant that Sollenberger's EMG only revealed "mild, borderline" right carpal tunnel syndrome. Tr. 73.

Dr. Maimon stated that Sollenberger did not have a severe impairment. Tr. 66. When Dr. Maimon was pressed on this point on cross-examination, he stated that "when I say there's no severe impairments, counselor, I mean that she doesn't equal or meet listings." Tr. 75. Dr. Maimon believed that Sollenberger was limited to lifting ten to twenty pounds, and could stand or sit for six hours in an eight hour workday. Tr. 74. Dr. Maimon also opined that Sollenberger could not climb ropes or ladders, was limited in reaching overhead with her upper left extremity, and should not be around fumes or dust. Id. Dr. Maimon stated that he did not agree with Dr. Khalid's opinion because it was not confirmed by Sollenberger's "findings on physical exam[ination] or, or the objective findings on x-ray and EMG [studies]." Id. Consequently, Dr. Maimon stated that he could not "follow the logic of" Dr. Khalid's residual functional capacity assessment. Id.

## C.    The Administrative Hearings

On December 22, 2011, Sollenberger's first administrative hearing was conducted. Tr. 22-60. At that hearing, Sollenberger testified that she showered,

washed dishes, and did light laundry, but she needed assistance dressing, shopping, vacuuming and sweeping.  Tr. 24-25.  She also testified that she could walk two and a half blocks before needing to rest, could only walk up four or five steps before having problems, and could only sit for ten to fifteen minutes before it became uncomfortable.  Tr. 27-28.  Sollenberger stated that her impairments caused her right hand to go numb "[a] lot of the time," causing her to drop objects.  Tr. 32.  She also testified that the pain caused depression and made her irritable, but that her depression medication helped a little bit.  Tr. 33.

Sollenberger stated that her medications made her "very tired."  Tr. 28-29.  Sollenberger stated that using a TENS unit eased her pain, and that epidural shots had also helped.  Tr. 30.  She further testified that, if she took her medications, she was "okay," but the medication made her sleepy.  Tr. 31.

Sollenberger offered additional testimony during the second administrative hearing on May 15, 2012.  Sollenberger reiterated that her medications caused her drowsiness.  Tr. 64.  This drowsiness caused her to nap during the day for one to two hours.  Id.

At the second administrative hearing, Michael Kibler, an impartial vocational expert, was called to give testimony.  Tr. 77.  The ALJ asked the vocational expert to assume a hypothetical individual with Sollenberger's age,

education, and work experience who was limited to light work[6] and could never

push or pull bilaterally.  Tr. 81.  Furthermore, the hypothetical individual could not

be required to use ladders or crawl, but could frequently balance and stoop, and

occasionally use stairs, kneel, or crouch.  Id.  The ALJ further proposed that this

hypothetical individual could only occasionally reach with her right hand, although

never above shoulder height, and could occasionally feel or perform fine

manipulation with her right hand.  Id.  The individual must avoid concentrated

exposure to vibration and irritants.  Id.  Finally, the ALJ limited the work to

simple, routine, and repetitive tasks.  Id.

    The vocational expert opined that this hypothetical individual would be able

to perform two jobs that exist in significant numbers in the national economy: a

conveyor line bakery worker and a surveillance system monitor.  Tr. 81-82.  After

remembering the limitation of simple, routine, and repetitive work, the vocational

expert told the ALJ to "disregard" the surveillance system monitor, and instead

stated that the individual could work as an usher.  Tr. 82.

---

[6] Light Work is defined by the regulations of the Social Security Administration as work "with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967.

The ALJ then modified the hypothetical question to include a sit/stand at will requirement.  Id.  The vocational expert testified that, with this additional requirement, the hypothetical individual would still be able to perform work as a conveyor line bakery worker, with a ten percent reduction in available jobs.  Id. When the ALJ asked if there was second job the individual could perform, the vocational expert testified "I'm going to say surveillance system monitor, I believe that's appropriate . . ."  Id.  On cross-examination, the vocational expert stated that Sollenberger could perform the jobs described even if she could never reach above her shoulder, and was limited to occasionally reaching with her right upper extremity.  Tr. 83.

III.   **Discussion**

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.  Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown v.

Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims. See 20 C.F.R. § 404.1520; Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91-92 (3d Cir. 2007).  This process requires the Commissioner

to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work, and (5) if not, whether he or she can perform other work in the national economy.  See 20 C.F.R. § 404.1520.   The initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden then shifts to the Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  Mason, 994 F.2d at 1064.

Sollenberger contends that the ALJ committed reversible error in the residual functional capacity determination at step four of the sequential process, and erred again at step five.

At step four of sequential evaluation process, the ALJ found that Sollenberger maintained the residual functional capacity to perform less than the full range of light work.  Tr. 15.  The ALJ found that Sollenberger was limited in performing light work inasmuch as she must be able to sit or stand at will during work, and can never push or pull bilaterally.  Id.  The ALJ further found that Sollenberger could not climb ladders or crawl, but could occasionally climb stairs,

kneel, and crouch, and could frequently stoop or balance.  Id.  Additionally, the ALJ found that Sollenberger could never reach overhead bilaterally, and could only occasionally reach or perform fine manipulation and feeling with her right upper extremity.  Id.  Furthermore, the ALJ found that Sollenberger must avoid concentrated exposure to vibration and irritants.  Id.  Finally, the ALJ found that Sollenberger was limited to work consisting of simple, routine, repetitive tasks.  Id. At step five, the ALJ found that Sollenberger was capable of working as a conveyor line bakery worker or a surveillance system monitor.  Tr. 19.

### A.    Side Effects of Sollenberger's Medication

Sollenberger first contends that the ALJ improperly failed to account for the side effects of her medication, primarily drowsiness.  The ALJ found that although Sollenberger claimed she experienced significant drowsiness due to her medication, her medical records did not support this contention.  Tr. 16.  The ALJ noted that Sollenberger had never reported any drowsiness to her doctors, and concluded that given the severity of the symptom alleged, the lack of any medical evidence whatsoever to support the claim "undermine[d] [Sollenberger's] credibility regarding to [sic] the degree of drowsiness/fatigue she reportedly experiences."  Id.  Nonetheless, the ALJ did account for medication side effects when limiting Sollenberger to only simple, repetitive, and routine tasks.  Tr. 18.

Sollenberger argues that the ALJ could not disregard her complaints of the severity of her symptoms based solely on the absence of corroborative evidence within her medical records, particularly in light of the fact that Jack Lavue, MD, testified that Sollenberger's alleged drowsiness was consistent with the side effects of narcotic medication.  Tr. 45.

However, substantial evidence supports the ALJ's determination that the totality of the evidence undercut Sollenberger's credibility with regards to the side effects of her medication.  As the ALJ noted, the medical records do not contain a single mention of drowsiness caused by Sollenberger's medications.  These records reveal that Sollenberger did complain of at least some medication side effects; she stopped using Tramadol because this medication caused nausea and an upset stomach.  Tr. 520.  At a different hospital visit, it was noted that ibuprofen also caused Sollenberger stomach problems.  Tr. 563.  Additionally, Sollenberger denied any significant side effects accompanying her medications, including narcotics such as Vicodin.  Tr. 531.  The ALJ also noted that Sollenberger "exhibited no difficulty maintaining her attentions and concentrations during the hearings held relative to this matter."  Tr. 14.

The ALJ's decision to discredit the severity of Sollenberger's medication side effects is consistent with the United States Third Circuit Court of Appeals decision in Burns v. Barnhart, 312 F.3d 113 (3d Cir. 2002).  There, the ALJ

rejected the plaintiff's complaints of drowsiness because "the record contained 'no significant complaints of side effects from medication,'" and because the plaintiff did not appear drowsy at the consultative examination or administrative hearing. ~~Id.~~ at 130-31.  The Third Circuit affirmed, finding that the ALJ properly rejected the plaintiff's complaints of drowsiness because the record did not reference "serious functional limitations" caused by drowsiness.  Id. at 131.

As in Burns, in this case the ALJ concluded that Sollenberger's drowsiness was overstated, in part because of the absence of any complaints of medication side effects to doctors and based on the ALJ's observations of Sollenberger at the two administrative hearings.  Tr. 14, 16.  Although this Court may have reached a different conclusion, the record supports the ALJ's determination that Sollenberger's complaints of drowsiness were not credible.  ~~See also,~~ ~~Powell v.~~ ~~Barnhart~~, 437 F.Supp.2d 340, 343-44 (E.D.Pa. 2006); Downs v. Sec'y of Health & Human Servs., No. 09-1366, 2010 WL 4024669, at *6 (W.D.Pa. Oct. 13, 2010).

### B.    Sollenberger's Mental Impairments

Sollenberger next argues that the ALJ committed reversible error by failing to account for any mental limitations in the residual functional capacity assessment.  The ALJ found that Sollenberger's depression and anxiety resulted in moderate difficulties with concentration, persistence, or pace given her reported difficulty concentrating.  Tr. 14.  However, the ALJ noted that Sollenberger was

able to finish tasks that she started and followed written and spoken instructions well.  <u>Id.</u>  The ALJ further noted that Sollenberger handled stress "'ok' most of the time[,] . . . handled changes in routine 'alright[,]'" and exhibited no difficulties maintaining attention or concentration at either of the administrative hearings.  <u>Id.</u> The ALJ further referenced the fact that Sollenberger could pay bills, count change, handle a savings account, and did not need to be reminded to take medicine or care for her personal needs.  <u>Id.</u>  Consequently, the ALJ found that Sollenberger's depression, in combination with her medication side effects and pain limited her to only simple, repetitive, and routine tasks.  Tr. 18.

As an initial matter, Sollenberger is incorrect in asserting that the ALJ failed to account for any mental limitations in the residual functional capacity assessment.  As noted above, the ALJ did limit Sollenberger to only simple, repetitive, and routine tasks.  <u>Id.</u>  Additionally, the evidence cited by the ALJ was valid, and supported the ALJ's determination that Sollenberger's depression and anxiety did not require greater limitations than those accounted for in the residual functional capacity assessment.

Sollenberger's assertion that <u>Burns</u> mandates a different conclusion is not convincing.  The Third Circuit in <u>Burns</u> found that a residual functional capacity assessment that limited the plaintiff to "simple repetitive one, two-step tasks" was insufficient because that statement did not specifically convey all of the plaintiff's

18

intellectual limitations as referenced in a medical examiner's report.  Burns, 312 F.3d at 123.  The Court concluded that the limitations imposed by the ALJ "certainly [did] not incorporate" medical findings that the plaintiff was borderline in areas of reliability, common sense, ability to function independently, and judgment.  Id.

Importantly, here there is no evidence in the record that Sollenberger's depression and anxiety result in any limitations beyond those imposed by the ALJ in the residual functional capacity assessment.[7]  Rather, the medical evidence indicated that Sollenberger's depression was "well controlled," tr. 638, and showed that Sollenberger's memory, cognition, mood, and affect were consistently normal.  Tr. 469, 471 521, 423, 528, 531, 536, 646, 648, 653, 656-57, 659.  Therefore, substantial evidence supported the mental limitations that the ALJ included in Sollenberger's residual functional capacity assessment.

### C.    Weight Given to the Residual Functional Capacity Assessments

Sollenberger further argues that the ALJ erred in failing to give greater weight to the report of Dr. Khalid, an examining physician than to non-examining physicians.  The ALJ "generally assign[ed] limited weight" to Dr. Khalid's opinion regarding lifting and carrying restrictions because it was not consistent with the

---

[7]  Ms. Pellegrino did opine that that Sollenberger was disabled based on the totality of her medical impairments.  Tr. 643-645.  This opinion did not clarify what limitations were caused by Sollenberger's depression.

evidence contained in the administrative record.  Tr. 17.  Instead, the ALJ gave

significant weight to the opinions of Dr. LeBeau and Dr. Maimon regarding lifting

and carrying restrictions because their opinions were consistent with the medical

evidence.  Id.  However, the ALJ did include additional restrictions not mentioned

by either doctor to accommodate some of Sollenberger's subjective complaints.

Id.

When an ALJ has weighed competing medical opinions, the district court's

review is limited to determining if there is substantial evidence to support the

ALJ's weighing of those opinions.  Monsour Med. Ctr. v. Heckler, 806 F.2d 1185,

1190 (3d Cir. 1986).  The district court may not reweigh the various medical

opinions in the record.  Id.  Although the opinion of a treating physician is entitled

to special weight, Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000), the fact

that a non-treating physician examined the claimant is only one factor that the ALJ

should consider in assigning weight to that opinion.  See 20 C.F.R. § 416.927(c).[8]

Here, the ALJ concluded that Dr. Khalid's opinion regarding lifting,

carrying, and sitting restrictions was inconsistent with Sollenberger's medical

records as a whole, and therefore gave limited weight to the opinion.  Tr. 17.

Substantial evidence supports this conclusion.  Dr. Khalid opined that Sollenberger

---

[8]  The Social Security Administration lists six factors in determining the weight assigned to a medical opinion: (1) whether the physician examined the claimant, (2) whether the physician treated the claimant, (3) evidence referenced by the physician supporting her/his opinion, (4) consistency of the opinion with the record as a whole, (5) specialization of the physician, and (6) any other factors that might support or contradict the opinion.  20 C.F.R. § 416.927(c).

could never lift or carry more than two pounds despite the fact that Sollenberger stated at the examination that she could lift up to five pounds.  Tr. 617, 623. Sollenberger's medical records also reveal that on one occasion she lifted and moved a refrigerator.  Tr. 455.  Finally, Sollenberger's medical records consistently revealed 4+/5 or 5/5 strength in her upper extremities.  Tr. 422, 423, 424, 426, 654.  The ALJ properly weighed the competing medical testimony contained in the administrative record and therefore, the ALJ's conclusions are supported by substantial evidence.  Consequently, this Court may not re-weigh the medical opinions, and must accept the ALJ's conclusion.

### D.      Sollenberger's Capability to Perform Jobs that Exist in Significant Numbers in the National Economy

At step five, the ALJ concluded that, given Sollenberger's residual functional capacity, she was capable of performing two jobs that exist in significant numbers in the national economy.  Tr. 18-19.  In making this determination, the ALJ posed a hypothetical question to a vocational expert.  Tr. 81-82.  The hypothetical question accurately reflected the ALJ's residual functional capacity assessment.  Id.  The vocational expert testified that under the circumstances presented in the hypothetical question, the individual would be able to work as a conveyor line bakery worker or a surveillance system monitor.  Tr. 82.

Sollenberger asserts that the ALJ's conclusion that Sollenberger was capable of performing work as a conveyor line bakery worker was not supported by

21

substantial evidence because the job requires occasional reaching, which the

Dictionary of Titles ("DOT") defines generally as "reaching in any direction."  Tr.

83-84.  Sollenberger claims this is fundamentally inconsistent with the ALJ's

requirement that Sollenberger never be required to reach above her head.  On its

face, this does present a conflict.  However, the vocational expert testified that,

even though Sollenberger was restricted to never reaching above her head, she

would still be capable of working as a conveyor line bakery worker.  Tr. 82.  On

cross-examination, the vocational expert reiterated that Sollenberger could perform

this work even though she could never reach above her head.  Tr. 83.  The

vocational expert's testimony was predicated on specific reach requirements rather

than the general reaching abilities referenced in the DOT.  Therefore, there was no

conflict between the vocational expert's testimony and the DOT.  To the extent

that there may have been any conflict, the vocational expert adequately explained

any conflict or variation.  Tr. 83-84.

Sollenberger also argues that the ALJ's determination that she could work as

a surveillance system monitor is not based on substantial evidence.  When the ALJ

posed a hypothetical question to the vocational expert incorporating the entire

residual functional capacity except for the sit/stand option, the vocational expert

initially opined that Sollenberger could work as a surveillance system monitor.  Tr.

81-82.  However, after remembering that Sollenberger was limited to only simple,

routine, and repetitive work, the vocational expert stated "[o]kay, then disregard the surveillance system monitor."  Tr. 82.  Later, after the ALJ included the sit-stand option, the vocational expert stated that he believe work as a surveillance system monitor would be "appropriate."  Id.  These two conclusions appear to be in direct contradiction, and consequently, it cannot be said that the ALJ's determination that Sollenberger could work as a surveillance system monitor is based on substantial evidence.  However, because Sollenberger could still perform work as a conveyor line bakery worker, this error did not affect the outcome of the case, and remand is not warranted based on this mistake. See, Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005).

**Conclusion**

A review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is affirmed.

An order consistent with this memorandum follows.

BY THE COURT:

s/Yvette Kane
Yvette Kane
United States District Judge

Dated: June 11, 2014